STATE of Missouri, Respondent,

v.

Robert B. MABRY, Appellant.

No. ED 91163.

Missouri Court of Appeals,
Eastern District,
Division One.

May 12, 2009.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 15, 2009.

---

Timothy J. Forneris, Assistant Public Defender, St. Louis, MO, for appellant.

Rachel D. Schwarzlose, Assistant Circuit Attorney, St. Louis, MO, for respondent.

PATRICIA L. COHEN, Judge.

## Introduction

Robert Mabry ("Defendant") appeals from the judgment of the Circuit Court of the City of St. Louis convicting him of two counts of violating an order of protection and one count of stalking. Defendant claims that the trial court erred by: (1) allowing the State to admit evidence of letters Defendant sent to the victim, M.W., which constituted uncharged misconduct; (2) failing to grant Defendant's motion for a continuance after the State failed to comply with the trial court's order to produce the contact information of "Bob from Qdoba"; (3) overruling Defendant's motion for judgment of acquittal and sentencing Defendant for stalking because the evidence was insufficient to prove that Defendant repeatedly and purposefully harassed M.W. by yelling at her; (4) granting the State leave to amend the charging dates in the information with respect to the stalking charge; and (5) entering a judgment of conviction for stalking because the jury instruction was fatally defective because it included the definition of "stalking" under Mo.Rev.Stat. § 565.225.2 instead of the definition provided by Mo.Rev.Stat. § 445.020.[1] We reverse in part and affirmed in part.

## Background

Defendant and M.W. met and began dating in November 2003. In July 2004, M.W. ended her relationship with Defen-

dant because it "was the third time he went into a rage" and she could not handle it anymore. Following the break-up, Defendant began leaving "threatening" messages on M.W.'s answering machine and "breaking into [her] computer using [her] email accounts." To avoid further contact with Defendant, M.W. sought an *ex parte* order of protection in September 2004.

On November 10, 2005, M.W. obtained a full consent order of protection against Defendant and renewed it on May 22, 2006.[2] Among other things, the protective order prohibited Defendant from threatening, abusing, or stalking M.W. or from communicating with M.W. in any manner or through any medium.

By mid–2006, the State had charged Defendant with five counts of violating the order of protection and one count of stalking.[3] On August 6, 2007, Defendant was tried by a jury on all six counts. The jury found Defendant not guilty on two counts of violation of the protective order but was unable to reach a verdict on the other four counts. The trial court declared a mistrial on the four remaining counts, and scheduled a re-trial.

Three days prior to the re-trial, on November 9, 2007, the trial court ordered the State to produce to defense counsel the contact information of a person, referred to in the record only as "Bob from Qdoba", who was a suspected witness to the events pertaining to one of the counts of violation

---

1. The order of Defendant's points on appeal has been rearranged.

2. The orders of protection were not made part of the record before this court, and our description of those orders is based on M.W.'s and police officer testimony at trial.

3. *See* Mo.Rev.Stat. § 455.010(10) (Cum.Supp. 2004) (defining "stalking" for violating a protective order as "when an adult purposely and repeatedly engages in an unwanted course of

conduct that causes alarm to another person when it is reasonable in that person's situation to have been alarmed by the conduct."); Mo.Rev.Stat. § 565.225.1(3) (Cum.Supp. 2004) (defining "harasses" in the context of criminal stalking as "to engage in a course of conduct directed at a specific person that serves no legitimate purpose, that would cause a reasonable person to suffer substantial emotional distress, and that actually causes substantial emotional distress to that person.").

of a protective order. Because the State did not possess "Bob's" information, the State filed a *nolle prosequi* as to the count connected with "Bob." On the day Defendant's trial was scheduled to begin, defense counsel moved for a continuance because the State had not produced "Bob's" information. In response, the prosecutor told the trial court that the State did not have "Bob's" information and was not calling him as a witness because the State had dismissed the count relevant to "Bob". The trial court denied the motion for continuance concluding that Defendant was not prejudiced because the events "Bob" allegedly witnessed no longer related to a charged offense.

Later that day, on November 13, 2007, a jury-trial on the remaining three counts began as scheduled. Viewed in the light most favorable to the verdict, the evidence at trial revealed the following:

Between August 2005 and March 2006, M.W. received four anonymous letters containing information which led her to believe that they were written and sent by Defendant. The first letter, received in August 2005, stated that if "you don't drop this now" private pictures of M.W. and excepts from her personal journal would "start showing up" at certain bars, M.W.'s work, and to specific addresses of friends and family from M.W.'s address book. After receiving the letter, M.W. felt "extremely threatened" because she received the letter only a few weeks before a hearing for her protective order against Defendant.

In October 2005, M.W. received the second letter, which referred to an occasion where M.W. had met with several male friends at a bar the previous week. M.W. testified that after receiving this letter she felt "stalked, threatened, in danger, [and] in danger for [her] friends since he was obviously following them as well."

In February 2006, M.W. received the third letter which mentioned the names of M.W.'s executive director and supervisor from her work. The letter also commented, "Got to work a little late today, huh[?]" Because she had in fact left for work fifteen minutes later than usual the day she received the letter, M.W. again felt "threatened, stalked, watched, afraid, and afraid for going to work."

In March 2006, M.W. received the fourth letter which referenced an occasion when M.W. had visited a male friend at a park near her house. M.W. testified that this letter caused her to feel that she was "still being watched ... [and] afraid that in her own neighborhood [she was] being watched closely."

After sending the letters, Defendant confronted M.W. in person on two separate occasions. First, on April 6, 2006, as M.W. was driving to work, she saw Defendant drive past her in the opposite direction. About fifteen minutes later, while M.W. was stopped at a red light, Defendant pulled up next to her, "rolled his window down, stuck his head out the window, and [ ] scream[ed] at [her]." M.W. kept her windows rolled up and indicated to Defendant that she could not hear him. Following the encounter, M.W. continued on her way to work and reported the incident to the police several weeks later.

The second incident occurred on June 2, 2006 while M.W. was driving a client who was diagnosed with paranoid schizophrenia. As M.W. was waiting in the exit lane to enter the highway, she saw Defendant drive past and turn into the exit lane two cars ahead of her. After seeing Defendant, M.W. "began shaking" and became "very scared" but did not want to distress her client. After both M.W. and Defendant turned on the highway, M.W. drove slowly so that Defendant could advance

down the highway and she could "proceed without being followed or noticed." M.W. then noticed that Defendant had slowed down and was in the right lane exiting the highway. As M.W. passed Defendant, he swerved into her lane missing her car by approximately three feet. While Defendant followed her, M.W. drove quickly up the next exit ramp and held her cell phone up so that Defendant could see that she was about to call 9–1–1. After she held up her cell phone, M.W. checked her rearview window and saw that Defendant had turned and drove the other direction. Following the incident, M.W. dropped off her client and immediately called the police. Soon thereafter, the police arrested Defendant.

At the close of the evidence, the jury returned guilty verdicts on all counts. Specifically, the jury found Defendant guilty of two counts of violating the protective order for yelling at M.W. on April 6, 2006 and swerving at her car on June 2, 2006, and guilty of one count of stalking for "repeatedly and purposefully harass[ing] [M.W.] by yelling at her" between March 21, 2006 and June 2, 2006. Thereafter, the trial court sentenced Defendant to three concurrent sentences of 270–days imprisonment. Defendant appeals.

### Discussion

*A. Evidence of Letters Sent by Defendant*

■ In his first point, Defendant contends that the trial court abused its discretion in permitting the State to introduce evidence of the four letters received by M.W. Specifically, Defendant claims that the letters were inadmissible because they: (1) had no probative value as they constituted evidence of uncharged crimes that occurred outside the charging period, and (2) lacked a proper foundation since they had nothing "in their contents or on their surface" to connect them with Defendant.

■ A trial court possesses broad discretion in the admission of evidence. *State v. Chism,* 252 S.W.3d 178, 182 (Mo.App. W.D.2008). "A trial court abuses its discretion when the decision is against the logic of the circumstances and when 'it is so arbitrary and unreasonable as to shock the sense of justice and indicates a lack of careful consideration.'" *Id.* (quotation and alteration omitted). This court will reverse the decision of the trial court only when it has abused its discretion and the defendant is thereby prejudiced. *Id.*

■ As Defendant correctly asserts, a criminal defendant can only be tried for the offenses which he or she is charged, and evidence of uncharged crimes, wrongs, or acts is inadmissible for the purpose of showing a defendant's propensity to commit such crimes. *State v. Williams,* 652 S.W.2d 102, 110 (Mo. banc 1983); *State v. Bernard,* 849 S.W.2d 10, 13 (Mo. banc 1993). However, evidence of uncharged misconduct may be properly admitted when such evidence is logically and legally relevant to proving the crime charged— *i.e.,* it has a legitimate tendency to establish the defendant's guilt of a charged crime and its probative value outweighs its prejudicial effect. *Bernard,* 849 S.W.2d at 13. Generally, evidence of uncharged misconduct is admissible when it "tends to establish": (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan; or (5) identity of the defendant. *Id.* (quoting *State v. Sladek,* 835 S.W.2d 308, 311 (Mo. banc 1992)) (quoting *People v. Molineux,* 168 N.Y. 264, 61 N.E. 286, 294 (1901)).

■ When considering the admissibility of a defendant's prior misconduct in adult abuse cases, this court has acknowledged that "a defendant's history of threatening

or violent conduct involving the same victim can be especially probative." *State v. Andrich,* 943 S.W.2d 841, 844 (Mo.App. E.D.1997). For instance, in *Andrich,* a jury found the defendant guilty of violating a protective order by waiting for the victim while she attended parent-teacher conferences for their son, following the victim to her car, and subsequently following her in his car for about two miles. *Id.* at 843. On appeal, Defendant claimed that the trial court abused its discretion when permitting the State to introduce evidence of his prior bad acts towards the victim, which included making harassing phone calls and writing harassing letters to the victim, physically abusing the victim three years earlier, threatening the victim to drop the charges against him, and previously following the victim in his truck. *Id.* at 844.

In *Andrich,* we held that the trial court did not abuse its discretion because the evidence of defendant's uncharged misconduct was relevant to show the defendant's intent to inflict injury upon the victim and demonstrate an absence of mistake or accident. *Id.* We also noted that the defendant's prior bad acts were not so remote in time as to be inadmissible as a matter of law. *Id.* Finally, we considered that in adult abuse cases a defendant's history of misconduct towards the victim can be especially probative because when "[c]onsidered in isolation, a defendant's outward conduct may be ambiguous or entirely lawful. Only by showing that history can the state establish the justifiable inference that a defendant's charged conduct was in fact intended to engender fear on the part of the victim and that defendant knew it was likely to do so." *Id.*

Here, similar to *Andrich,* evidence of Defendant's letters to M.W. tended to establish that Defendant's actions towards M.W. were not an accident or mistake, but rather that he "knowingly" violated the terms of the protective order and "purposefully" stalked M.W. Additionally, the evidence of Defendant's prior misconduct towards M.W. was relevant to show that M.W. was reasonably "alarmed" by Defendant's conduct and that she suffered "substantial emotional distress," as required to find Defendant guilty of violating a protective order and stalking. Because the letters were logically and legally relevant to prove Defendant's guilt of the crimes charged, the trial court did not abuse its discretion by admitting the letters.

Next, Defendant contends that the trial court erred in admitting the letters as evidence because the State failed to present a proper foundation. Specifically, Defendant claims that because the letters were typewritten, unsigned, and contained no physical evidence connecting them to him, the State failed to establish that he actually wrote and sent the letters to M.W.

■■■■ At trial, Defendant objected to the admission of the letters on the ground that they were inadmissible as uncharged misconduct, but did not challenge the foundation for the letters. On appeal, a defendant is not permitted to rely on a theory different than the one presented in his or her objection at trial. *State v. Dampier,* 862 S.W.2d 366, 376 (Mo.App. S.D.1993). Because Defendant did not advance his theory of lack of foundation at trial, the issue is not properly preserved for appeal. *See State v. Driver,* 912 S.W.2d 52, 54 (Mo. banc 1995). Consequently, our review of Defendant's claim is limited to plain error, which requires the finding of "evident, obvious, and clear" error that so substantially impacts Defendant's rights that manifest injustice will occur if the error is left uncorrected. *State v. Lucio,* 247 S.W.3d 131, 135 (Mo.App. S.D.2008). Here, no such error occurred as the State elicited sufficient testimony from M.W. regarding the content of the letters to properly dem-

onstrate that Defendant wrote and sent the letters. *See, e.g., State v. Skinner,* 734 S.W.2d 877, 882–83 (Mo.App. E.D.1987) (holding that a defendant's authorship of a letter could be proved by circumstantial evidence). Point denied.

### B. Failure to Grant Continuance Regarding "Bob from Qdoba"

In his second point, Defendant seeks a new trial on the grounds that the trial court abused its discretion by denying his request for a continuance after the State's failed to produce "Bob from Qdoba's" contact information. By denying his request for a continuance, Defendant claims that the trial court violated the discovery requirements of Rule 25.03 and his constitutional rights to present a defense and to a fair trial. We disagree.

▮ First, Defendant has failed to prove a discovery violation. Under Rule 25.03(A), upon the defendant's request, the State must disclose to the defendant all material and information within the State's "possession or control." "This duty to disclose includes not only information that is actually known to the prosecutor, but also information that may be learned through reasonable inquiry." *State v. Rippee,* 118 S.W.3d 682, 684 (Mo.App. S.D.2003). Under Rule 25.04(A), upon the defendant's request and the trial court's subsequent order, the State is required to disclose "material and information not covered by Rule 25.03." "These rules do not require the State to disclose what it does not have." *State v. Johnston,* 957 S.W.2d 734, 748 (Mo. banc 1997).

▮ Defendant has failed to show that the State possessed "Bob's" information or that the State could have obtained such information through a reasonable inquiry. After defense counsel sought a continuance, the prosecutor informed the trial court that the State did not have "Bob's"

information and that the State was not calling "Bob" as a witness. Defense counsel did not dispute the prosecutor's statements. Likewise, in his appellate brief, Defendant assumes that the State failed to comply with Rule 25.03 without pointing to anything in the record showing that the State had or could have reasonably obtained "Bob's" information. Based on this record, there is no indication that the State violated the requirements of Rule 25.03 when failing to produce "Bob's" contact information.

▮ Second, even assuming the State violated Rule 25.03 by failing to produce "Bob's" information, Defendant is not entitled to a new trial for the trial court's failure to grant a continuance. The criminal discovery rules are designed to allow a defendant the opportunity to prepare in advance for trial and to avoid surprise. *State v. Scott,* 943 S.W.2d 730, 735 (Mo. App. W.D.1997). If a discovery violation occurs, the determination of an appropriate remedy is within the discretion of the trial court. *Id.* An abuse of discretion for failing to impose a remedy for a discovery violation occurs only when it results in fundamental unfairness to the defendant. *State v. Royal,* 610 S.W.2d 946, 951 (Mo. banc 1981). In this context, "fundamental unfairness" turns on whether there was a reasonable likelihood that the earlier disclosure of the requested evidence would have affected the result of the trial. *Scott,* 943 S.W.2d at 735–36.

Here, Defendant fails to show that the trial court's denial of his request for a continuance resulted in fundamental unfairness. Assuming that "Bob" could have been located and was available to testify at trial, it is unclear how "Bob" would have been a relevant witness as his expected testimony only pertained to a count which the State had dismissed. Additionally, the State's failure to provide "Bob's" informa-

tion did not result in unfair surprise or hamper Defendant's ability to prepare for trial because the State did not call "Bob" as a witness and Defendant did not have to defend himself against the charge at issue. Under these circumstances, the trial court did not abuse its discretion by denying Defendant's motion for a continuance because, even assuming the State violated Rule 25.03 and "Bob" could have been located, there is not a reasonable likelihood that Defendant's investigation of "Bob" would have affected the outcome of the trial. Point denied.

### C. Sufficiency of Evidence for Stalking Charge

■ In his third point, Defendant claims that the trial court erred in overruling his motion for judgment of acquittal at the close of the evidence and sentencing him for stalking in violation of Mo.Rev. Stat. § 565.225 (Cum.Supp.2004) because the State failed to present sufficient evidence that Defendant "repeatedly and purposefully harassed [M.W.] by yelling at her." On a challenge to the sufficiency of the evidence, this court accepts as true all of the evidence favorable to the verdict, including all favorable inferences drawn from the evidence, and disregards all evidence and inferences to the contrary. *State v. Presberry*, 128 S.W.3d 80, 90 (Mo. App. E.D.2003). Our review is limited to whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt. *Id.*

Under Section 565.225.2, "[a]ny person who purposely and repeatedly harasses or follows with the intent of harassing another person commits the crime of stalking." Mo.Rev.Stat. § 565.225.2 (Cum.Supp.2004). As used in that section, "harasses" is defined, in part, as "to engage in a course of conduct directed at a specific person that serves no legitimate purpose.... " Mo.Rev. Stat. § 565.225.1(3) (Cum.Supp.2004). "*Course of conduct*" is defined as "a pattern of conduct composed of a series of acts, which may include electronic or other communications, over a period of time, however short, evidencing a continuity of purpose", excluding constitutionally protected conduct. Mo.Rev.Stat. § 565.225.1(1) (Cum.Supp.2004). This statutory language, which includes phrases such as "repeatedly harasses" and "a pattern of conduct composed of a series of acts", clearly requires that a person commit *more than one* act of harassment towards a victim to be found guilty of criminal stalking under Section 565.225.[4]

The jury in this case was instructed that to find Defendant guilty of stalking, it must find that "between March 21, 2006 and June 2, 2006 in the City of St. Louis, State of Missouri, [Defendant] repeatedly and purposefully harassed [M.W.] by yelling at her, ..." Additionally, the instructions provided the definitions of "harassed" and "course of conduct" as they appear in Section 565.225 (Cum.Supp.2004).[5]

Defendant argues that the evidence presented at trial was insufficient to support the jury's verdict finding him guilty of stalking because the State failed to present evidence that Defendant "yelled" at M.W. on more than one occasion. Specifically,

---

4. The legislature's intent is even more explicitly set forth in the 2008 amendments of Section 565.225 which define "Course of conduct", in part, as "a pattern of conduct composed of two or more acts.... " Mo.Rev. Stat. § 565.225.1(1) (Cum.Supp.2009).

5. Although Section 565.225.2 does not limit prohibited conduct to "yelling", the verdict directing instruction offered by the State and submitted by the trial court allowed for a guilty verdict as to the stalking charge only with a finding that Defendant repeatedly yelled at M.W.

Defendant contends that the evidence showed that he only yelled at M.W. on April 6, 2006, when Defendant pulled up next to M.W. and screamed at her from his car.

In response, the State contends that the jury, using a reasonable definition of "yelling", could have determined that Defendant's actions on April 6, 2006 and on June 2, 2006, when Defendant swerved at M.W.'s car on the highway, constituted yelling at M.W. on more than one occasion. The State's contention, however, does not comport with the plain meaning of the word "yelling." The plain meaning of the word "yell", as ascertained from its dictionary definition, is "to utter a loud cry, scream, or shout." THE MERRIAM-WEBSTER DICTIONARY 858 (paperback 5th ed.1997). At the very least, the term "yelling" contemplates an audible act by a person. Under this definition, it would be unreasonable for the jury to have concluded that Defendant's act of swerving at M.W.'s car constituted "yelling."

While the State proved other types of conduct towards M.W. that could have constituted harassment within the meaning of the statute, even when viewed in the light most favorable to the verdict, the record reveals only one instance where Defendant harassed M.W. by "yelling" at her. The State's position that Defendant's other encounters with M.W., even though Defendant did not speak to M.W. in any manner, constituted "yelling" is unsupportable. When reviewing the sufficiency of the evidence, this court may "may 'not supply missing evidence, or give the State the benefit of unreasonable, speculative or forced inferences.'" *State v. Whalen,* 49 S.W.3d 181, 184 (Mo. banc 2001) (quotation and internal brackets omitted). Thus, the evidence was insufficient to support the jury's guilty verdict with respect to the stalking charge and the judgment of con-

viction and sentencing on that count must be reversed. Point granted.

### D. Remaining Points on Appeal

We need not reach Defendant's remaining two points on appeal because they are moot as they exclusively challenge the stalking conviction which is reversed.

### Conclusion

The judgment with respect to Defendant's conviction and sentence for stalking in violation of Mo.Rev.Stat. § 565.225 is reversed. In all other aspects, the judgment is affirmed.

KURT S. ODENWALD, P.J., and GLENN A. NORTON, J., Concur.